IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Christopher J.,[1]                    )        C/A No.: 1:21-1607-SVH
                                      )
                Plaintiff,            )
                                      )
        vs.                           )
                                      )        ORDER
Kilolo Kijakazi,[2] Acting            )
Commissioner of Social Security       )
Administration,                       )
                                      )
                Defendant.            )
_____         )

        This appeal from a denial of social security benefits is before the court

for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B)

(D.S.C.), and the order of the Honorable Mary Geiger Lewis, United States

District Judge, dated July 21, 2021, referring this matter for disposition.

[ECF No. 8]. The parties consented to the undersigned United States

Magistrate Judge's disposition of this case, with any appeal directly to the

Fourth Circuit Court of Appeals. [ECF No. 6].

        Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social

Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Fed. R. Civ. P. 25(d), she is substituted for former Commissioner Andrew Saul as the defendant in this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On November 30, 2018, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on September 30, 2018. Tr. at 145, 146, 206–07, 210–15. His applications were denied initially and upon reconsideration. Tr. at 147–51, 154–59. On September 28, 2020, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Walter C. Herin, Jr. Tr. at 34–93 (Hr'g Tr.). The ALJ issued an unfavorable decision on December 2, 2020, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 28, 2021. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 47 years old at the time of the hearing. Tr. at 44. He completed the eighth grade. Tr. at 46. His past relevant work ("PRW") was as an apartment maintenance worker, a demolition worker, and an electrician helper. Tr. at 85. He alleges he has been unable to work since September 30, 2018. Tr. at 206.

2.    Medical History

Plaintiff was admitted to Parrish Medical Center ("PMC") from September 30 to October 1, 2018, for chest pain. Tr. at 316. After he was admitted, his troponin level increased from 0.11 to 0.48. Tr. at 317. Rene Celis, M.D., performed cardiac catheterization that revealed severe coronary artery disease ("CAD") involving a completely-occluded right coronary artery ("RCA") with reconstitution from left to right collaterals into the posterior descending artery ("PDA") and a severe high-grade stenosis in the mid left anterior descending artery ("LADA"). *Id.* Plaintiff was hospitalized in the intensive care unit prior to being transported to Holmes Regional Medical Center ("HRMC"). *Id.* His discharge diagnoses included: CAD with recommended coronary artery bypass grafting ("CABG"), hypertension, cocaine abuse, and tobacco abuse. Tr. at 316–17.

Plaintiff was hospitalized at HRMC from October 1 through October 6, 2018. Tr. at 350. Tamim Antaki, M.D., noted Plaintiff had experienced a non-ST elevation myocardial infarction ("NSTEMI") prior to admission. *Id.* Matthew Campbell, M.D. ("Dr. Campbell"), indicated Plaintiff had a history of CAD and had undergone percutaneous coronary intervention six years prior. Tr. at 353. Plaintiff underwent endoscopic saphenous vein harvest from the left thigh and two vessel CABG, using a left internal mammary artery ("LIMA") in situ skeletonized graft to the LADA and saphenous vein grafts from the aorta to the PDA. Tr. at 350. He experienced post-operative complications that included blood-loss anemia, mild thrombocytopenia, and acute systolic heart failure due to volume overload. *Id.*

Plaintiff presented to the emergency room ("ER") at PMC on November 13, 2018, after suffering a dog bite to his left wrist and hand. Tr. at 407. His blood pressure was elevated at 184/103 and 178/110 mmHg. Tr. at 411. Physician assistant Paul T. Jennings assessed elevated blood pressure and dog bite of left wrist and hand. Tr. at 413. He discharged Plaintiff with antibiotics and instruction to follow up with his primary care physician in two to three days. Tr. at 413–14.

On January 30, 2019, Plaintiff's blood pressure was elevated at 178/110 mmHg. Tr. at 438. David Cundey, M.D. ("Dr. Cundey"), recorded normal findings on exam. Tr. at 439–40. He assessed CAD, hypertension, and history

4

of open-heart surgery. Tr. at 440. He ordered fasting lab studies, instructed Plaintiff to return in two weeks for a treadmill exercise test, and prescribed Lisinopril, Hydrochlorothiazide, potassium, and Lipitor. *Id.*

On February 19, 2019, Plaintiff underwent a stress test, but only walked for four minutes, five seconds. Tr. at 465. Over the period, his heart rate increased from 70 to 120 beats per minute ("BPM") and his blood pressure increased from 110/68 to 158/68 mmHg. *Id.* Plaintiff had no chest pain suggestive of ischemia, but stopped due to fatigue and shortness of breath on exertion. *Id.* Dr. Cundey recorded normal findings on physical exam. Tr. at 460–61. He noted Plaintiff's shortness of breath on exertion and recommended a regular exercise program to increase his endurance. Tr. at 461.

On February 20, 2019, state agency psychological consultant Michael Neboschick, Ph.D. ("Dr. Neboschick"), reviewed the record, completed a psychiatric review technique ("PRT"), considered Listing 12.06 for anxiety and obsessive-compulsive disorders, and concluded Plaintiff's mental impairment was non-severe, as it resulted in no limitations. Tr. at 100–01, 110–11.

On March 7, 2019, state agency medical consultant Maliha Khan, M.D. ("Dr. Khan"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 50

pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ladders, ropes, or scaffolds; and frequently stoop, kneel, crouch, crawl, and climb ramps and stairs. Tr. at 102–03, 112–13.

Plaintiff presented for a primary care visit on March 20, 2019. Tr. at 492. He described aching, acute and intermittent left-sided chest pain and pressure that radiated to his left arm, as well as dyspnea on exertion. *Id.* His blood pressure was elevated at 183/103 mmHg, but his respiratory and cardiovascular findings were normal. Tr. at 492–93. An electrocardiogram ("EKG") showed some ST-segment depression at leads V5 and V6. Tr. at 494. The provider prescribed Wellbutrin XL 150 mg for adjustment disorder. Tr. at 493. He referred Plaintiff to Rodney Rhinehart, M.D. ("Dr. Rhinehart"), for a cardiology second opinion. Tr. at 494.

Plaintiff presented to Dr. Rhinehart as a new patient on March 22, 2019. Tr. at 645. He endorsed intermittent exertional shortness of breath and vague chest pain. *Id.* He denied taking nitroglycerin. *Id.* An EKG showed non-specific T-wave abnormality. *Id.* Plaintiff admitted he continued to smoke on some days. *Id.* His blood pressure was elevated at 174/100 mmHg. Tr. at 647. Dr. Rhinehart recorded normal findings on physical exam, including nonlabored respirations, clear breath sounds, no rales, no wheezes,

no rhonchi, regular rhythm, no murmur, and normal heart sounds. *Id.* He prescribed Imdur 30 mg four times a day and Ranexa 500 mg twice a day. Tr. at 646. He indicated Plaintiff might have class 2–3 dyspnea from ischemic myopathy. *Id.* He provided exercise guidelines, instructed Plaintiff on a low sodium diet, stressed medication compliance, and indicated he should return in three weeks. *Id.*

On April 10, 2019, Plaintiff reported continued chest and left arm pain. Tr. at 642. He described a recent incident in which he became short of breath and experienced heart racing after walking into Wal-Mart. *Id.* He said he thought he had experienced a panic attack. *Id.* Plaintiff noted he had run out of Metoprolol the prior week and had been unable to afford to refill it. *Id.* He also indicated he had not been able to afford to fill the prescription for Imdur. *Id.* He felt that Ranexa had not been particularly helpful. *Id.* He was concerned about possible sleep apnea, as his fiancée reported he sometimes stopped breathing while sleeping. *Id.* An EKG showed nonspecific T-wave abnormality. *Id.* Plaintiff's blood pressure was elevated at 182/143 mmHg. Tr. at 643. Dr. Rhinehart recorded normal findings on physical exam, including normal heart sounds and respiratory findings. *Id.* He stated Plaintiff had symptoms consistent with angina and his most recent episode might have been caused by him running out of his beta-blocker. Tr. at 644. He gave Plaintiff samples of Bystolic and told him to continue to use samples of

Ranexa. *Id.* He recommended Plaintiff fill the prescription for Imdur and be screened for sleep apnea, but Plaintiff indicated he could not afford sleep apnea screening. *Id.* Dr. Rhinehart recommended Plaintiff apply for disability, given his CAD, ischemic cardiomyopathy, and ejection fraction of 25%. *Id.* He felt that Plaintiff's cardiac issues would prevent him from working. *Id.*

On May 15, 2019, Plaintiff complained of chest pain and dyspnea on exertion that had been ongoing since his CABG surgery and that limited his lifestyle. Tr. at 639. He indicated he could not afford his medications. *Id.* He denied diaphoresis, orthopnea, syncope, paroxysmal nocturnal dyspnea ("PND"), edema, and dizziness. Tr. at 640. His blood pressure was elevated at 163/118 mmHg. *Id.* Dr. Rhinehart observed Plaintiff to be very anxious, tearful, and crying. Tr. at 639. He otherwise recorded normal findings on physical exam, including normal respirations and cardiac sounds. *Id.* He assessed hypertension, snoring, chest pain, ischemic cardiomyopathy, CAD of the native coronary artery without angina pectoris, dyspnea, and anxiety. Tr. at 640–41. He recommended Plaintiff undergo cardiac catheterization and encouraged him to comply with his medication. Tr. at 641. However, he acknowledged Plaintiff's compliance with medications was limited by his financial situation and stated he would try to give Plaintiff as many samples as possible. *Id.* Dr. Rhinehart indicated he felt that Plaintiff should be on

permanent disability. *Id.* He included a final medication list that included aspirin 81 mg, Bystolic, Imdur ER 30 mg, Metoprolol Tartrate 50 mg, Ranexa 500 mg, Wellbutrin XL 150 mg, and Zestoretic 20-12.5 mg. *Id.*

Plaintiff presented to licensed independent social worker John C. Young ("SW Young") on June 4, 2019, for counseling targeted at reducing depression and anxiety. Tr. at 485. SW Young observed Plaintiff to be walking unsteadily and changing positions frequently, and Plaintiff reported severe lower back pain since stepping out of a car at his brother's house and being unable to straighten up. *Id.* Plaintiff indicated he had not applied for prescription assistance from Wellvista because he was unwilling to provide information from his fiancée. *Id.* He also reported he had been unable to undergo a heart catheterization because he could not afford it. *Id.* Plaintiff endorsed chest and arm pain with minimal exertion. *Id.* SW Young noted Plaintiff was maintaining a positive attitude, despite his troubles. *Id.* He recommended Plaintiff follow a heart healthy diet and walk when he was able. *Id.* He diagnosed adjustment disorder with mixed emotions of anxiety and depression. *Id.*

Plaintiff presented to a provider for his physical impairments the same day. Tr. at 488–91. He reported continued chest pain, dyspnea on exertion, and a four-day history of back pain. Tr. at 488. He indicated he had received sample medications from the cardiologist that had helped minimize his pain.

*Id.* His blood pressure was elevated at 172/117 and 171/117 mmHg. Tr. at 489. The provider observed Plaintiff to be in distress secondary to pain and to have tenderness at L4 and L5 and spasms in his bilateral lower lumbar spine and paraspinal muscles. *Id.* He noted Plaintiff had non-labored breathing, no retractions, normal respiratory rate, and regular cardiac rate and rhythm without murmur, gallop, or rub. *Id.* He prescribed Cyclobenzaprine for muscle spasms and Meloxicam for pain and inflammation and refilled Wellbutrin XL 300 mg for anxiety disorder. Tr. at 490.

Plaintiff presented to Augusta University Medical Center for chest pain on July 9, 2019. Tr. at 507, 538. He reported experiencing chest pain off and on for several months, after running out of Ranexa and Bystolic. Tr. at 507. He stated the symptoms occurred with minimal activity and while he was at rest. *Id.* He indicated he experienced the symptoms upon lying down at night, prompting him to sleep in a recliner. *Id.* He described left-sided chest pain that radiated down his left arm and caused paresthesia throughout the arm. *Id.* Plaintiff's blood pressure was assessed during triage as 161/118 mmHg. Tr. at 538. An EKG showed no ischemic changes. Tr. at 507. Troponin level and chest x-rays were negative. *Id.* The attending physician admitted Plaintiff for stress testing. *Id.* Plaintiff exercised for approximately three minutes, but was unable to complete the test. Tr. at 571. He reported substernal chest pressure he rated as an eight of 10 with radiation to the left

shoulder and shortness of breath. *Id.* He indicated the pain would persist for 10 minutes after he stopped to rest. Tr. at 572. Plaintiff's lab studies supported a new diagnosis of type 2 diabetes mellitus. Tr. at 508. He underwent cardiac catheterization that showed severe two-vessel CAD, patent LIMA–LADA with occluded LADA beyond anastomosis, patent SVG–PDA, and non-obstructive ramus intermedius and left circumflex, by instantaneous wave-free ratio. Tr. at 581. An echocardiography ("echo") showed: normal left ventricular size and mildly reduced function with estimated ejection fraction of 40–45%, with moderate left ventricular hypertrophy and moderate diastolic dysfunction; normal right ventricular size and moderately reduced function; and trace mitral and tricuspid regurgitation. Tr. at 623.

Plaintiff was discharged on July 11, 2019, with diagnoses that included type 2 diabetes mellitus, acute kidney injury, abnormal stress EKG, bypass graft stenosis, CAD in native artery, generalized anxiety disorder, gastroesophageal reflux disease ("GERD"), hypertension, history of CABG, hyperlipidemia, marijuana use, stented coronary artery, transaminitis, and unstable angina. Tr. at 507. At the time of discharge, his blood pressure had decreased to 125/81 mmHg. Tr. at 508.

Plaintiff followed up with Dr. Rhinehart on July 17, 2019. Tr. at 636. He reported feeling much better. Dr. Rhinehart noted the heart

11

catheterization showed widely-patent grafts and chronically-occluded LADA. *Id.* He opined that Plaintiff's symptoms were "probably stress related." *Id.* Plaintiff denied dizziness, diaphoresis, orthopnea, palpitations, syncope, and PND, but endorsed chest pain. Tr. at 637. His blood pressure was elevated at 140/100 mmHg. *Id.* An EKG showed sinus rhythm with nonspecific ST-T abnormalities. Tr. at 638. Dr. Rhinehart recorded no abnormal cardiac or respiratory findings on physical exam. Tr. at 637. His impressions were CAD of native coronary artery without angina pectoris, ischemic cardiomyopathy, chest pain, snoring, dyspnea, anxiety, and hypertension. *Id.*

Plaintiff followed up with SW Young on September 9, 2019. Tr. at 661. He complained of chest pain, left arm pain, and irregular heartbeat upon engaging in slightly-exertional activities, such as washing his car or walking out to cook on his grill. *Id.* However, he noted the pain had decreased in intensity. *Id.* He reported worry over being unable to work and pay his bills, but admitted he was less anxious and depressed and had fewer panic attacks since starting Prozac. *Id.* SW Young noted positive signs of depression and anxiety and no suicidal ideation on mental status exam. *Id.*

On October 21, 2019, Plaintiff reported occasional chest pain when he felt "worked up with stress." Tr. at 683. He indicated financial issues from being out of work were contributing to his stress and anxiety. *Id.* A review of systems was negative for dyspnea, chest pain, diaphoresis, orthopnea,

palpitation, syncope, and PND. Tr. at 684. Dr. Rhinehart recorded normal findings on physical exam. *Id.* He stated Plaintiff was still having a lot of problems with stress and anxiety, but was experiencing no meaningful chest pain, had stable lab studies, and was tolerating his medication well. Tr. at 685. He increased Prozac to 40 mg a day and continued Plaintiff's other medications. *Id.* He stated Plaintiff was "permanently disabled from a cardiac standpoint." *Id.*

Plaintiff presented to John B. Bradley, Ph.D. ("Dr. Bradley"), for a consultative psychological exam on October 30, 2019. Tr. at 649. He alleged anxiety, fear of loud noises and being around others, and trouble sleeping. *Id.* He reported a history of incarceration for drug distribution in 1990 and 2006. *Id.* He admitted to using cocaine from 2010 to 2017, but denied using since 2017. Tr. at 650. He admitted to drinking two bottles of wine per week. *Id.* He reported exertion and anxiety caused him shortness of breath and chest pain. *Id.* He complained of depression due to loss of income, financial difficulties, sleep disturbance, and inability to do the things he used to do. *Id.* He endorsed paranoid thoughts that others intended to harm him, feeling sad most of the time, difficulty sleeping, lack of interest, difficulty concentrating, lack of energy, and poor self-esteem. Tr. at 651. He described spending most of his time at home, having no friends, washing dishes, taking out the garbage, preparing food when necessary, driving, and attempting to walk, but

being unable to go far due to fatigue, chest pain, and difficulty breathing. *Id.* Dr. Bradley indicated Plaintiff was tense, anxious, tearful, and appeared depressed during the evaluation, but was able to comprehend and follow instructions. *Id.* He stated Plaintiff had blunted affect and anxious and depressed mood. *Id.* He assessed Plaintiff's speech, thought content, memory, intelligence, and judgment as normal, but his insight as poor. Tr. at 651–52. He indicated Plaintiff's concentration appeared to be below average and he appeared somewhat distractible during the evaluation. Tr. at 652. Dr. Bradley's diagnostic impressions were unspecified depressive disorder and unspecified anxiety disorder. Tr. at 652. He considered Plaintiff mildly to moderately limited in activities of daily living ("ADLs"), moderately-to-markedly impaired in social functioning, moderately limited in persistence, pace, and concentration, but possibly moderately-to-markedly limited in persistence, pace, and concentration, given his combination of psychological and heart problems. Tr. at 652–53. He stated Plaintiff "may be a distraction to others in a vocational setting" and "[h]is intellectual level and depression may interfere with his reasoning, his ability to solve problems, and his ability to remember detailed instructions," but further noted his "motivation is questionable." Tr. at 652. He indicated Plaintiff reported the ability to manage money in his own best interest. Tr. at 653.

On November 7, 2019, state agency psychological consultant Janet Telford-Tyler, Ph.D. ("Dr. Telford-Tyler"), reviewed the evidence, considered Listing 12.06, and assessed Plaintiff's mental impairment as severe. Tr. at 123–24, 138–39. She found Plaintiff to have mild limitations in understanding, remembering, or applying information and adapting or managing oneself and moderate limitations in interacting with others and concentrating, persisting, or maintaining pace. *Id.* Dr. Telford-Tyler completed a mental RFC assessment, finding moderate limitations as to the following abilities: to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. Tr. at 126–27, 141–42.

On November 11, 2019, a second state agency medical consultant, Marvin Bittinger, M.D. ("Dr. Bittinger"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; frequently balance; and occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. Tr. at 124–26, 140–41.

Plaintiff reported chest discomfort on December 12, 2019. Tr. at 664. He indicated he had experienced the discomfort for five days, after raking leaves. *Id.* He described a pins-and-needles sensation in his left arm and leg with continued activity and standing too long. *Id.* He also endorsed some neck soreness and left hip pain that radiated to his leg and foot. *Id.* He denied dyspnea. *Id.* The provider noted moderate tenderness on the left side of Plaintiff's neck, but normal respirations and cardiovascular rate and rhythm. Tr. at 665. He assessed other muscle spasm, cervical radiculopathy, and body mass index 28.0–28.9. *Id.* He prescribed Cyclobenzaprine 10 mg and Prednisone 50 mg for cervical radiculopathy and muscle spasms. *Id.*

During a visit with SW Young on January 21, 2020, Plaintiff reported living with his mother, but was vague as to the situation that led to the change. Tr. at 668. He indicated he had recently attended a party with a large crowd, felt nervous, and had to leave. *Id.* He stated he had developed chest pain when he attempted to rake his yard and walk short distances. *Id.* He complained of crying two to three times a day, poor sleep, vivid dreams, and panic attacks approximately four times a week. *Id.* SW Young observed that Plaintiff "made very little eye contact and continuously bit his fingernails." *Id.* He noted positive signs of depression and anxiety, but no suicidal ideation. *Id.* He planned to schedule Plaintiff for a visit with a psychiatrist. *Id.*

SW Young completed a medical opinion form addressing Plaintiff's ability to do mental work-related activities. Tr. at 655–58. He assessed Plaintiff's abilities as "fair"[3] with respect to: remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, and travel in unfamiliar places. Tr. at 655–57. He assessed "poor"[4] abilities to maintain attention for two hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination with or proximity to others without being unduly distracted, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, deal with normal work stress, be aware of normal hazards and take appropriate precautions, understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, deal with stress of semiskilled and skilled work, interact appropriately with the general public, and use public transportation. *Id.* SW Young indicated Plaintiff had no useful ability to

---

[3] The form defined "fair" to mean "[a]bility to function in this area is seriously limited, but not precluded." Tr. at 655.

[4] The form defined "poor" to mean "[m]arked limitations in ability to function in this area." Tr. at 655.

complete a normal workday and workweek without interruptions from psychologically-based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 656. He stated Plaintiff had a problem dealing with even minimal physical effort without shortness of breath and chest and left arm pain. *Id.* He noted being around people caused Plaintiff to experience "pronounced anxiety." *Id.* He indicated Plaintiff had significant difficulty with concentration. Tr. at 657. He stated Plaintiff had problems with any tasks that required even minimal physical labor, could only walk a short distance at a time, was very anxious about the status of his physical health, and experienced depression because of his limitations. *Id.* He considered Plaintiff capable of managing benefits in his own best interest. Tr. at 658. He estimated Plaintiff would be absent from work an average of more than four days per month due to his impairments or treatment. *Id.*

Plaintiff also followed up with Dr. Rhinehart on January 21, 2020. Tr. at 679. He complained of chest pain, shortness of breath, and anxiety and said he could not do much activity without having symptoms. *Id.* He reported waking during the night with diaphoresis and shortness of breath. *Id.* Dr. Rhinehart recorded no abnormal findings on physical exam. Tr. at 680. He felt some of Plaintiff's exertional dyspnea and chest pain was related to angina and some was related to anxiety, but he could not distinguish which

came first. *Id.* He recommended screening for sleep apnea, which he felt could be contributing to a lot of Plaintiff's issues. *Id.* He also recommended changing Plaintiff's anxiety medication, as his routine appeared to be ineffective. *Id.* He felt Plaintiff's cardiac impairments would allow him to qualify for disability benefits and indicated he would assist Plaintiff as much as possible. *Id.* He did not change Plaintiff's cardiac treatment plan. *Id.*

On February 25, 2020, SW Young observed Plaintiff to be out of breath when he entered the office. Tr. at 671. Plaintiff reported walking to the mailbox and to take out the trash, but said he felt shortness of breath, chest pain, and left arm pain with any type of exertion. *Id.* He indicated he assisted his mother with some household tasks, but mostly stayed in his room and spent a lot of time on his phone. *Id.* He complained of difficulty sleeping and worry over his outstanding bills. *Id.* SW Young noted signs of depression, but no suicidal ideation. *Id.* He stated Plaintiff appeared motivated. *Id.* He assessed generalized anxiety disorder. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on September 28, 2020, Plaintiff testified he was unmarried and had a 10-year-old daughter who lived with her mother in Florida. Tr. at 44–45. He stated he lived with his mother and grandmother.

19

Tr. at 45. He said he was 6' tall, weighed 185 pounds, and was right-handed. Tr. at 48. He indicated his driver's license had been suspended because he failed to pay child support. *Id.*

Plaintiff said he typically travelled by car to the grocery store or Wal-Mart two to three times a week. Tr. at 49. He testified he was able to bathe, dress, and use the toilet without assistance. Tr. at 50. He stated he could heat food in a microwave and make a sandwich. Tr. at 51. He indicated he often sat in the car while his mother shopped for groceries because he did not do well around people. *Id.* He denied washing, drying, folding, and putting away his laundry, as his mother performed these tasks for him. *Id.* He said he attempted to sweep and vacuum the floor. Tr. at 52. He indicated he sometimes handwashed dishes. *Id.* He denied collecting and taking out the garbage. *Id.* He said he assisted his mother in cleaning the bathroom. *Id.* He indicated he had attempted to rake the yard, but had experienced chest pain and arm numbness upon doing so. *Id.*

Plaintiff testified he had last worked for four or five months as a maintenance worker in an apartment complex. Tr. at 53. He said the job required painting, some carpentry, and light electrical work. Tr. at 54–55. He stated he had previously performed demolition work requiring he lift up to 50 pounds. Tr. at 56–57. He indicated he had been injured while performing the demolition work, received Workers' Compensation benefits, and was

eventually terminated from his job. Tr. at 58. He stated he had worked as an electrician's apprentice beginning in 2014. Tr. at 59. He said he lifted 50 to 75 pounds with assistance on that job. *Id.*

Plaintiff stated he applied for disability benefits because he could not support himself and his children. Tr. at 61. He said he experienced chest pain, shortness of breath, pain in his shoulder, and numbness in his left arm with everyday tasks like taking a shower, brushing his teeth, walking to the mailbox, and climbing into his bed. *Id.* He indicated his symptoms worsened following his October 2018 surgery. *Id.* He said he experienced confusion. Tr. at 62. He testified he felt heart racing and arm numbness at least three times a day on four or five days per week. Tr. at 62–63. He stated he felt nauseated when he stood and brushed his teeth. Tr. at 63.

Plaintiff testified he slept in a recliner at night because he felt tension in his neck and shoulder or shortness of breath when he attempted to lie flat. Tr. at 64. He indicated his anxiety also caused shortness of breath and chest pain. *Id.* He said even talking caused him to become short of breath. Tr. at 65. He stated he spent most of his time alone in his room and would speak to his mother and grandmother from time to time. *Id.* He acknowledged his doctors had recommended some medications he could not afford. *Id.* He said he was otherwise following his doctors' recommendations. *Id.* The ALJ asked Plaintiff whether he had attempted to obtain his medication through a

program called Wellvista, had contacted pharmacies about free or low-cost medication options, or had requested assistance directly from prescription drug companies. Tr. at 66. Plaintiff denied having done so. *Id.*

Plaintiff stated he did not sleep much and often stopped breathing while he was sleeping. Tr. at 67. He said his doctor had referred him for a sleep apnea evaluation, but he could not afford it. *Id.*

Plaintiff's counsel mentioned a 2017 record that referenced cocaine use and asked him whether he had used cocaine or any other illicit drug since September 30, 2018. Tr. at 68. Plaintiff denied having used any substances since that time. *Id.* He described his prior drug use as recreational. Tr. at 69.

Plaintiff testified he attempted to walk outside, but developed shortness of breath after walking for five to ten minutes. Tr. at 70. He said he helped with a few chores around the house and by raking the yard, but would develop chest pain and return to his sit in his room. *Id.* He indicated he spent most of his time reading and watched television infrequently. *Id.*

Plaintiff stated his doctors had recommended no further surgical procedures. Tr. at 71. He said his doctor was most concerned with his sleep disturbance. *Id.* He indicated his lack of sleep during the night caused him to feel tired and fatigued and to sleep off and on throughout the day. *Id.* He reported his medication caused him to feel restless and on edge. *Id.* He stated he had experienced panic attacks since his most recent surgery. Tr. at 72. He

indicated he continued to cry two or three times a day. *Id.* He said his panic attacks were triggered by worrying. Tr. at 72–73. He estimated he experienced heart-related symptoms three times per week without any activity. Tr. at 73. He noted the episodes lasted 10 to 20 minutes. *Id.*

Plaintiff estimated he could walk for four to five minutes before having to stop to catch his breath and wait for the pounding in his chest to stop. Tr. at 73–74. He stated he could also stand for four to five minutes at a time. Tr. at 74. He said he could sit for six to eight minutes with his feet on the floor and would be so limited due to restlessness. Tr. at 76. He indicated he was "always up and down." *Id.* He estimated he could lift up to 10 pounds. *Id.* Plaintiff denied receiving any specific restrictions from his physicians, except that his cardiologist said he would not be able to work. *Id.*

Plaintiff denied using nitroglycerin. Tr. at 78. He confirmed he had undergone cardiac stenting and CABG twice. *Id.* He admitted he smoked cigarettes in the past, but indicated he had stopped after placement of the second cardiac stent. Tr. at 79.

Plaintiff testified he had attended one visit with a psychologist, but had left prior to a second visit because he felt uncomfortable sitting in the lobby while others were coming and going from the office. Tr. at 79–80. He said Fluoxetine helped his anxiety a little. Tr. at 80–81. He denied taking insulin for diabetes and noted Metformin effectively controlled his blood sugar. Tr. at

81. He denied smoking marijuana, but admitted he ate brownies with marijuana baked into them. *Id.* He said they calmed him and helped him sleep. Tr. at 81–82. He indicated he consumed the brownies infrequently because he could not afford them. Tr. at 82. He admitted he had been incarcerated in Florida and South Carolina for drug distribution. *Id.* He said he stopped drinking beer, but continued to drink wine from time to time. Tr. at 83.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Amy Vuyovich reviewed the record and testified at the hearing. Tr. at 83–91. The VE categorized Plaintiff's PRW as an apartment maintenance worker, *Dictionary of Occupational Titles* ("*DOT*") No. 382.664-010, requiring medium exertion and a specific vocational preparation ("SVP") of 3; a demolition worker, *DOT* No. 869.664-014, requiring heavy exertion and an SVP of 4; and an electrician helper, *DOT* No. 829.684-022, requiring medium exertion per the *DOT* and heavy exertion as performed and an SVP of 3. Tr. at 85. The ALJ asked if any skills would transfer from Plaintiff's PRW to work at the sedentary exertional level. *Id.* The VE testified there were no transferable skills from Plaintiff's PRW. Tr. at 86. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift up to 50 pounds occasionally and up to 25 pounds frequently and could no more than frequently stoop, crouch, crawl, kneel, and

climb stairs and ramps. *Id.* He asked if the restrictions would allow for performance of Plaintiff's PRW. *Id.* The VE testified the hypothetical individual could perform Plaintiff's PRW as an apartment maintenance worker. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was restricted as follows: able to perform simple tasks requiring a reasoning level no higher than 1 or 2 as defined in the *DOT*; able to maintain concentration, persistence, and pace in order to perform such tasks for at least two hours at a time and to complete an eight-hour workday without supervision; should have no more than occasional interaction with the public; could lift and carry up to 20 pounds occasionally and 10 pounds frequently; could no more than frequently balance; could no more than occasionally stoop, crawl, crouch, kneel, and climb ramps and stairs; could not climb ladders, ropes, or scaffolds; should have no required exposure to unprotected heights or dangerous machinery; and should have no concentrated exposure to extremes of humidity or hot or cold temperature. Tr. at 87. The VE confirmed the ALJ's impression that the restriction would not allow for Plaintiff's PRW. *Id.* The ALJ asked the VE if she could identify any jobs available in the national economy that the individual could perform. *Id.* The VE identified light jobs with an SVP of 2 as a cleaner/housekeeper, *DOT* No. 323.687-014, and a garment sorter, *DOT* No.

222.687-014, with approximately 223,000 and 76,000 position in the national economy, respectively. *Id.*

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile with the following restrictions: able to perform simple tasks at a reasoning level of 1 or 2 as defined in the *DOT*; can maintain concentration, persistence, and pace in order to perform such tasks for at least two hours at a time and to complete an eight-hour workday without special supervision; no required interaction with the public; no more than occasional interaction with coworkers; in a lower-stress work environment with no requirement to meet a rigid, inflexible production or pace requirements and no high-speed assembly line work; able to make simple decisions, but no complex decision-making requirement; able to adapt to routine change, but no need to adapt to frequent changes at the work station; lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; stand or walk up to two hours in aggregate and sit at least six hours in an eight-hour workday; no more than occasionally stoop, balance, crouch, kneel, and climb stairs or ramps; not required to crawl or climb ladders, ropes, or scaffolds; no required exposure to unprotected heights or dangerous machinery; and no required concentrated exposure to extremes of humidity or hot or cold temperatures. Tr. at 88. The ALJ acknowledged these restrictions would not allow for performance of Plaintiff's PRW. *Id.* He asked

the VE to identify jobs that could be performed with the specified restrictions. Tr. at 89. The VE identified sedentary jobs with an SVP of 2 as a lens inserter, *DOT* No. 713.687-026, an eyeglass polisher, *DOT* No. 713.684-038, and an electronics inspector, *DOT* No. 726.684-050, with 12,000, 11,300, and 10,700 positions in the national economy, respectively. *Id.*

The ALJ asked the VE to consider that the individual's symptoms would render him unable to maintain concentration, persistence, and pace on even simple tasks for two hours at a time, causing him to be off-task for 15% or more of the workday. *Id.* He asked the VE to address the impact of such a limitation. *Id.* The VE testified an individual who was off-task for 15% or more of the workday would be unable to engage in any work. *Id.*

The ALJ asked the VE to consider that the individual would need to lie down and take an extended break for at least an hour a day, in addition to normal work breaks. *Id.* He asked the VE to explain the impact of such a restriction. Tr. at 90. The VE testified it would preclude all work. *Id.*

Plaintiff's counsel asked the VE if the identified jobs required minimal exertion from time to time and if an individual would be considered off-task if he developed shortness of breath and had to stop and rest for several minutes after engaging in activities requiring minimal exertion. *Id.* The VE testified all jobs required minimal exertion, but provided no further response to the question. Tr. at 91.

Plaintiff's counsel asked the VE if work would be precluded if the individual were to miss an average of two days per month. *Id.* The VE stated it would. *Id.*

Plaintiff's counsel asked the VE if the individual could perform the identified jobs if he were to need to shift from sitting to standing every 10 minutes. *Id.* The VE testified work would be precluded if the individual's need to shift positions caused him to be off-task too often. *Id.*

### 2. The ALJ's Findings

In his decision dated December 2, 2020, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.
2. The claimant has not engaged in substantial gainful activity since September 30, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. The claimant has the following severe impairments: coronary artery disease (CAD), status-post stenting and coronary artery bypass grafting (CABG) X2, with chronic dyspnea on exertion; ischemic heart disease, status-post myocardial infarction; hypertension; cervical degenerative disc disease with radiculopathy; and adjustment disorder, with mixed depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform simple tasks that have reasoning level of 1 or 2 as defined in the Dictionary of Occupational Titles (DOT), and can maintain concentration, persistence, and pace on such tasks for at least

two hours at a time and complete an eight-hour workday without special supervision. He should have no required interaction with the public. He should work in a lower stress work environment, defined as one where he does not have to meet a rigid, inflexible production or pace requirement, make complex decisions, or adapt to frequent changes in the workstation. He can make simple decisions and adapt to routine changes. He can lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; can stand and walk an aggregate of up to two hours and can sit at least six hours of an eight-hour workday; can no more than occasionally stoop, balance, crouch, kneel and climb stairs or ramps, but cannot crawl or climb ladders, ropes, or scaffolds. He should have no required exposure to unprotected heights or dangerous machinery, and no concentrated exposure to extremes of humidity, heat or cold.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 5, 1972 and was 45 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 30, 2018, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 17–29.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the ALJ did not comply with SSR 96-8p in assessing Plaintiff's RFC and failed to properly evaluate Plaintiff's subjective allegations as to his symptoms; and

2) the ALJ erred in finding Dr. Rhinehart's opinion unpersuasive.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial

gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should

the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Subjective Symptom Evaluation and RFC Assessment

Plaintiff presents his allegations that the ALJ erred in evaluating his statements as to his symptoms and assessing his RFC as separate arguments. However, his argument is essentially that the ALJ failed to consider the limiting effects of his reported symptoms of frequent shortness of breath, chest pain, arm numbness, and confusion in assessing his RFC. [ECF No. 16 at 15–25. Therefore, it is appropriate to consider these arguments together.

Plaintiff specifically argues the ALJ did not comply with SSR 96-8p by ignoring evidence that he lacked the ability to perform even minimal activities on a sustained basis and failing to adequately explain how he accounted for cardiac symptoms. *Id.* at 15–21. He claims the ALJ erred in discrediting his statements based, in part, on the fact that he did not exhibit any significant aggravating or precipitating behavior during the hearing. *Id.* at 24–25.

The Commissioner argues the ALJ thoroughly discussed the medical and other evidence relating to Plaintiff's heart condition and other physical impairments and explained how he accounted for the impairments and the

34

limitations they imposed in the RFC assessment. [ECF No. 18 at 19–21]. She maintains the ALJ thoroughly considered all the evidence and that none of the evidence the ALJ failed to explicitly discuss in his decision would compel a contrary conclusion. *Id.* at 21–23. She claims the ALJ considered all Plaintiff's subjective complaints and explained his conclusion was based on the fact that Plaintiff did not consistently endorse shortness of breath and chest pain in his complaints to his medical providers and occasionally denied these symptoms, was able to effectively control his symptoms with medication, and reported ADLs that were inconsistent with the functional limitations he alleged. *Id.* at 26. She claims the ALJ's brief mention of Plaintiff's demeanor during the hearing was appropriate pursuant to SSR 16-3p. *Id.* at 27.

The claimant's RFC represents the most he can still do, despite limitations imposed by his impairments and symptoms. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC assessment must consider all the claimant's impairments and must be based on all the relevant evidence in the case record. *Id.*; SSR 96-8p, 1996 WL 374184, at *2. The ALJ must first identify the limitations and restrictions imposed by the claimant's medically-determinable impairments. SSR 96-8p, 1996 WL 374184, at *1. He should subsequently engage in a function-by-function assessment of the claimant's physical, mental, sensory, and other work-related abilities. *Id.*

The ALJ must consider evidence as to the claimant's pain and other symptoms, including his subjective allegations, in assessing the RFC. 20 C.F.R. §§ 404.1529, 416.929. "Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)); *see also* 20 C.F.R. § 416.929(b), (c). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)); *see also* 20 C.F.R. § 416.929(b). If the ALJ concludes the impairment could reasonably produce the symptoms the claimant alleges, he is to proceed to the second step, which requires him to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c); *see also* 20 C.F.R. § 416.929(c). If the evidence supports a finding that the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the claimant is "entitled to rely exclusively on subjective evidence to prove" his symptoms are "so continuous and/or so severe that [they] prevent him from working a full eight hour day." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006).

The second determination requires the ALJ to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [the claimant's] history, the signs and laboratory findings, and statements by [the claimant's] medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Other evidence relevant to the evaluation includes "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." SSR 16-3p, 2017 WL 5180304, at *6. These factors include: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ is required to explain which of the claimant's alleged symptoms he found "consistent or inconsistent with the evidence in [the]

record and how [his] evaluation of the individual's symptoms led to [his] conclusions." SSR 16-3p, 2017 WL 5180304, at *8. He must "must build an accurate and logical bridge" between the evidence and his conclusion as to the intensity, persistence, and limiting effects of the claimant's symptoms. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Afpel*, 277 F.3d 863, 872 (7th Cir. 2000)).

The ALJ must include a narrative discussion explaining the restrictions included in the RFC assessment. SSR 96-8p, 1996 WL 374184, at *7. The narrative discussion should reference specific medical facts, such as medical signs and laboratory evidence, and non-medical evidence, including daily activities and observations. *Id.* The ALJ "must explain how any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.*

Plaintiff specifically challenges the ALJ's finding that he had the RFC to lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; stand and walk an aggregate of up to two hours; sit at least six hours of an eight-hour workday; and occasionally stoop, balance, crouch, kneel, and climb stairs or ramps. Tr. at 21. He appears to argue the ALJ did not consider that even sedentary work would require some exertion that would exacerbate chest pain, shortness of breath, left arm pain, and confusion. *See* ECF No. 16 at 17–21.

In explaining the RFC assessment, the ALJ noted he had considered Plaintiff's alleged symptoms, as set forth on disability forms and in his testimony, as well as the medical opinions and the prior administrative medical findings. Tr. at 22, 26–27. He agreed that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record." Tr. at 23. He stated there was "minimal evidence to support the claimant's allegedly disabling functional limitations in conjunction with the alleged onset date" and indicated the objective evidence was "fully consistent with the above residual functional capacity." *Id.* He noted the record contained minimal evidence to support Plaintiff's allegations of severely disabling functional limitations and his allegations were "not fully supported by the objective medical evidence, the medical records, the findings of the State agency and consultative examiner, Dr. Bradley." *Id.*

Contrary to Plaintiff's allegation, the ALJ did not ignore objective evidence that supported his alleged cardiac symptoms. The ALJ summarized evidence from Plaintiff's treatment records, including diagnostic findings, observations, medical procedures, and his reports to his providers. Tr. at 23–25. The ALJ cited the September and October 2018 records that included

indications of sinus bradycardia on EKG, lab studies showing elevated troponin levels, a conclusion that Plaintiff had a non-ST elevation myocardial infarction, results of cardiac catheterization, a failed attempt at cardiac stenting, and the two-vessel CABG procedure. Tr. at 23. He referenced the February 2019 cardiac stress test and findings of elevated blood pressure. *Id.* He discussed generally unremarkable July 2019 findings on echo, EKG, chest x-ray, cardiac stress test, lab studies, and heart catheterization. Tr. at 24. He cited subsequent lab studies that revealed normal findings. *Id.*

Further review of the ALJ's decision refutes Plaintiff's allegation that the ALJ ignored cardiac symptoms and reflects his compliance with SSR 16-3p and 20 C.F.R. § 404.1529 and § 416.929. The ALJ wrote the following: "A thorough review of follow-up medical records throughout 2018 and 2019, reflected sporadic complaints of chest pain and shortness of breath with exertion (Exhibits 5F, 7F, 8F, 9F and 10)." Tr. at 23. He further acknowledged: "Medical records encompassing March 2019 through June 2019 . . . reflected continued complaints of chest pain and discomfort with exertion (Exhibit 10F)." *Id.* He noted Plaintiff was hospitalized in July 2019, after presenting to the ER with chest pain. Tr. at 24. He indicated: "In September 2019, the claimant reported continued chest pain, left arm pain and irregular heart rate when there was slight exertion such as washing his car or cooking on his grill." *Id.* He acknowledged Plaintiff's October 2019

complaint of occasional chest pain and his December 2019 report of chest discomfort while raking leaves. *Id.* He referenced Plaintiff's January 2020 complaint of continued episodes of chest pain and shortness of breath (Exhibit 16F)." *Id.* He noted Plaintiff's February 2020 "treatment records reflected complaints of shortness of breath with any type of exertion (Exhibit 15F)." *Id.*

Although Plaintiff maintains the ALJ did not explain which of his statements were inconsistent with the other evidence of record, it is clear from the ALJ's decision that he rejected Plaintiff's allegations that the frequency and intensity of his cardiac symptoms would preclude him from functioning in any job. Despite his acknowledgment of Plaintiff's complaints of cardiac symptoms, the ALJ provided multiple reasons, consistent with SSR 16-3p, for declining to impose additional restrictions in the RFC assessment, including references to Plaintiff's providers' observations, his statements concerning his symptoms, his providers' impressions, his ADLs, his use of medications, and observations from the hearing.

The ALJ stated Plaintiff's providers' observations during exams did not fully corroborate his allegations. *See* Tr. at 23 ("Examinations during this period consistently reflected overall negative respiratory, cardiac, musculoskeletal and neurological examinations. Specifically, examinations consistently reflected non-labored respirations, equal breath sounds,

symmetrical wall expansion, no chest wall tenderness, and a normal heart rate and rhythm."); Tr. at 24 (noting in October 2019, "[a] thorough examination reflected normal respiratory, cardiovascular, musculoskeletal and psychological findings"; in December 2019, "the claimant exhibited a normal respiratory and cardiovascular examination and was in no acute distress (Exhibit 15F)"; in January 2020, "a thorough examination reflected normal respiratory, cardiovascular, musculoskeletal and psychological findings").

The ALJ further considered Plaintiff's impressions to his providers to be somewhat inconsistent with his allegations, noting "follow-up treatment records in July 2019, reflect the claimant to be feeling much better with no dyspnea, shortness of breath, syncope or palpitations (Exhibit 12F). While the claimant continued to report some chest pain, this was noted to be significantly improved and believed probably stress related." Tr. at 24. He cited Plaintiff's September 2019 report that the pain he felt when engaging in exertional activities was less intense. *Id.* He noted Plaintiff reported in October 2019 that he experienced chest pain only when he was "worked up with stress (Exhibit 16F)." *Id.* Thus, the ALJ appropriately compared Plaintiff's statements throughout the record to his testimony. *See* SSR 16-3p, 2017 WL 5180304, at *8.

The ALJ cited findings from the treating and examining providers as to the effects of Plaintiff's impairments in accordance with 20 C.F.R. § 404.1529(c)(4) and § 416.929(c)(4). He noted Dr. Rhinehart's impression that Plaintiff "was having problems with stress and anxiety but not meaningful chest pain and that his labs were stable and he was tolerating his medication well." *Id.* He acknowledged Dr. Rhinehart's subsequent impression that Plaintiff's "exertional dyspnea and chest pain was angina, but also noted significant issues with anxiety." *Id.* He referenced Dr. Bradley's findings that Plaintiff could comprehend and follow instructions, had normal attention and concentration skills, demonstrated no cognitive deficits, and scored 30/30 on a mini mental examination. Tr. at 25.

The ALJ considered Plaintiff's ADLs in accordance with SSR 16-3p and 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3). He found the evidence showed Plaintiff's ADLs were somewhat limited, but inconsistent with a totally debilitating impairment. Tr. at 26. He referenced Plaintiff's abilities to bathe, dress, and feed himself and perform household chores such as washing dishes, taking out the garbage, sweeping the floor, cleaning the bathroom, and preparing his own food Tr. at 25–26. He noted no physician had imposed restrictions on Plaintiff's ADLs. Tr. at 25. Although Plaintiff maintains the ALJ considered these activities without accounting for his reports that these activities precipitated his cardiac symptoms, the undersigned notes the ALJ

did not fully credit his reports and pointed to other evidence in the record that undermined such reports.

The ALJ also considered Plaintiff's medication history in accordance with SSR 16-3p and 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3). He noted the stability of Plaintiff's medications and their general effectiveness in reducing his symptoms. Tr. at 26. He indicated Plaintiff had reported no side effects from his medications. *Id.*

The ALJ also cited his observations during the hearing as inconsistent with Plaintiff's allegations. He wrote:

> At the recent telephone hearing, I did not perceive any significant aggravating or precipitating factors. I did not perceive any outward signs of pain, agitation or significant deficits in concentration, attention or remembering, in order to meet the basic mental demands of work on a sustained basis. I additionally did not perceive any unusual behavior or mannerisms. The claimant appeared to be alert and responded to questions appropriately and intelligently.

*Id.* Citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976), and *Wilson v. Heckler*, 734 F.2d 513 (11th Cir. 1984), Plaintiff argues this "sit and squirm" test was inappropriate, as it allowed the ALJ to substitute his opinion for those of medical providers and theoretically encourages claimants to manufacture symptoms or decline to appear before an ALJ. [ECF No. 16 at 24–25]. Plaintiff's argument would be more persuasive if the ALJ's observations were contrary to those of Plaintiff's medical providers. However,

as discussed above, the ALJ's observations were consistent with Plaintiff's providers' benign observations on physical exams. *See* Tr. at 23, 24.

Furthermore, Plaintiff's argument is undermined by provisions in SSR 16-3p. The ALJ is to consider "any personal observations" of non-medical sources, including agency personnel who interviewed the claimant, "in terms of how consistent those observations are with the individual's statements about his or symptoms as well as with all of the evidence in the file." SSR 16-3p, 2017 WL 4180304, at *7. A claimant would theoretically have the same motivation to "manufacture symptoms" before non-medical sources, particularly agency personnel, as he would before the ALJ. However, these individuals' observations are specifically considered relevant pursuant to SSR 16-3p. The SSR further instructs ALJs to consider "[a]ny other factors concerning an individual's functional limitations and restriction due to pain or other symptoms." *Id.* at *8 (citing 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). An ALJ's observations during a hearing are certainly "other factors concerning" the claimant's functional limitations or restrictions.

The ALJ provided the following additional narrative explanation in accordance with SSR 96-8p:

> Clearly, in light of the objective medical findings, the treatment records, the findings of the State agency mental health consultant (at the reconsideration level), and the findings of Dr. Bradley, I find the claimant's impairments would not prevent, at least, unskilled sedentary work. I note the residual functional capacity assessment considers and full[y] accommodates the

45

> combined effect of his impairments in finding that he could not perform light or strenuous (medium or heavy work activities) or skilled or semi-skilled activities and tasks. Given the totality of the evidence, I believe the residual functional capacity assessment accurately assesses the claimant's functional ability, and per the vocational expert's testimony, he can perform other jobs in the national economy.

Tr. at 26. He further explained he had not considered the state agency medical consultants' opinions fully persuasive, as he found Plaintiff "more reasonably limited to sedentary work according to the medical evidence of record." *Id.* He stated he had found the opinion of the state agency psychological consultant at the reconsideration level to be more persuasive than the opinion of the psychological consultant at the initial level, had adopted the opined limitations, and had "further added a restriction to a lower stress work environment." *Id.* He indicated he included "mental limitations to simple routine tasks, no public interaction, no more than occasional interaction with coworkers, and work in a lower stress environment" to accommodate the limitations Dr. Bradley perceived. *Id.* He rejected SW Young's opinion, as it appeared to be based on physical, as opposed to mental, impairments. Tr. at 27. He wrote: "I fully accommodated the physical limitations in reducing the claimant to sedentary work. I fully accommodated the mental impairment of anxiety by limiting him to no interaction with the public and no more than occasional interaction with coworkers in a lower stress work environment." *Id.* He rejected additional

restrictions as "not warranted due to the lack of objective medical evidence of functional limitations." *Id.*

In accordance with SSR 96-8p, the ALJ rationally explained that Plaintiff's cardiac impairments and symptoms would reasonably permit him to perform a reduced range of sedentary work with postural and environmental restrictions. Although the record reflects Plaintiff's frequent complaints of chest pain, shortness of breath, and left arm pain and some indications of confusion, the ALJ provided a well-reasoned explanation for concluding the reported symptoms did not prevent Plaintiff from performing the work in the RFC assessment on a regular and continuing basis. He pointed to Plaintiff's reports to his providers of some decreases in symptoms with medication and his providers' impressions that Plaintiff's psychological condition played a significant role in producing the symptoms. The ALJ examined the evidence as to factors that precipitated Plaintiff's psychological reactions and restricted the work environment to one that would not include factors likely to trigger such reactions.

In light of the foregoing, substantial evidence supports the ALJ's evaluation of the intensity, persistence, and limiting effects of Plaintiff's alleged symptoms and his RFC assessment.

###### 2.   Dr. Rhinehart's Statements

In multiple treatment notes, Dr. Rhinehart noted his impression that Plaintiff was unable to work and should apply and be approved for disability benefits. On April 10, 2019, Dr. Rhinehart wrote: "Agree that he should try to apply for disability with his coronary disease, ischemic cardiomyopathy and ejection fraction of 25 percent. Really do not feel that he will be able to work with cardiac issues." Tr. at 644. He further noted: "I do not think given his ejection fraction is low in his history that probably he will not ever be able to have meaningful employment." *Id.* On May 15, 2019, Dr. Rhineheart indicated: "I do think he should be on permanent total disability." Tr. at 641. On October 21, 2019, he noted: "I think he is permanently disabled from a cardiac standpoint." Tr. at 685. On January 21, 2020, Dr. Rhinehart wrote: "[d]o think he will qualify for disability from a cardiac standpoint and will try to assist him as much as possible." Tr. at 680.

Plaintiff argues the ALJ erred in finding Dr. Rhinehart's opinion unpersuasive. [ECF No. 16 at 29]. He maintains the ALJ ignored much of the evidence in concluding Dr. Rhinehart's opinion was inconsistent with other treatment notes and his markedly-reduced ejection fraction. *Id.*

The Commissioner argues substantial evidence supports the ALJ's treatment of Dr. Rhinehart's statements because they were not medical opinions as defined by the applicable regulations. [ECF No. 18 at 28–30]. She

maintains that to the extent Dr. Rhinehart's opinion was supported by an ejection fraction of 25%, this was a one-time finding and Plaintiff's ejection fraction improved thereafter. *Id.* at 30.

Regulations applicable to cases filed on or after March 27, 2017, define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:

(1)    Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

(2)    Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, coworkers, or work pressures in a work setting;

(3)    Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(4)    Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

The revised regulations further specify an ALJ is not to defer to or give any specific weight to a medical opinion based on its source. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ must consider in the decision how persuasive he found all the medical opinions based on the following factors:

(1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b), (c), 416.920c(b), (c). However, supportability and consistency are considered the most important factors in assessing the persuasiveness of an opinion, and the ALJ must articulate how he considered the supportability and consistency factors in evaluating each medical opinion. 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2). Relevant to the supportability evaluation, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In evaluating the consistency factor, "[t]he more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The ALJ addressed Dr. Rhinehart's impressions as follows:

I find the opinion in the cardiology treatment notes at Exhibit 16F from Providence Heart are not persuasive. Although the notes state "I think he is permanently disabled from a cardiac standpoint," that opinion is inconsistent with and not supported by the treatment notes that found no meaningful chest pain and stable laboratory findings on October 21, 2019; and a clinical examination that appears entirely normal on January 21, 2020.

Tr. at 27. He further noted inconsistency between Dr. Rhinehart's impression and Plaintiff's noncompliance with advice to stop smoking and his history of alcohol and cocaine abuse.[7] *Id.*

Dr. Rhinehart's impressions do not qualify as medical opinions pursuant to 20 C.F.R. § 404.1513(a)(2) and § 416.913(a)(2). Dr. Rhinehart indicated Plaintiff could not work or have meaningful employment, should apply for and would meet qualifications for disability benefits, and was disabled. *See* Tr. at 641, 645, 680, 685. However, he did not provide an impression as to Plaintiff's specific mental, physical, environmental, or other abilities and restrictions. *See* 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

Although Dr. Rhinehart's impressions did not qualify as medical opinions pursuant to the regulations, the ALJ still proceeded to consider the persuasiveness of his impressions pursuant to 20 C.F.R. § 404.1520c and § 416.920c. He cited inconsistencies between Dr. Rhinehart's statements, the laboratory findings, and Plaintiff's failure to comply with instruction to stop using tobacco and alcohol. *See* Tr. at 27. He further found Dr. Rhinehart's impressions were not supported by his finding of no meaningful chest pain and normal observations on exams. *Id.*

---

[7] The record contains no evidence of cocaine abuse following the October 2018 hospitalization, but Plaintiff admitted to continued consumption of wine. *See* Tr. at 83, 650. During the hearing, Plaintiff testified he had not smoked since his bypass surgery, but Dr. Rhinehart's records reflect that Plaintiff was an "[o]ccasional cigarette smoker" and a "[c]urrent some day smoker." *See* Tr. at 636, 639, 642, 645, 679, 683.

Elsewhere in the decision, the ALJ summarized treatment notes from Dr. Rhinehart, providing support for his conclusion. He noted that during a July 2019 visit, Plaintiff reported "feeling much better with no dyspnea, shortness of breath, syncope or palpitations (Exhibit 12F). While the claimant continued to report some chest pain, this was noted to be significantly improved and believed probably stress related." Tr. at 24. The ALJ addressed Plaintiff's October 2019 visit with Dr. Rhinehart, writing:

> [C]ardiology treatment records noted some occasional chest [pain], but only when he gets worked up with stress (Exhibit 16F). He additionally expressed having financial issues with being out of work. A thorough examination reflected normal respiratory, cardiovascular, musculoskeletal, and psychological findings. In summary, the claimant's treating cardiologist, Rodney Rhinehart, M.D., assessed the claimant as having problems with stress and anxiety but no meaningful chest pain and that his labs were stable and he was tolerating his medication well.

Tr. at 24. He further indicated:

> In January 2020, cardiology treatment records noted continued episodes of chest pain and shortness of breath (Exhibit 16F); however, a thorough examination reflected normal respiratory, cardiovascular, musculoskeletal and psychological findings. Dr. Rhinehart assessed that the claimant's exertional dyspnea and chest pain was angina, but also noted significant issues with anxiety. Dr. Rhinehart additionally noted symptoms consistent with sleep apnea, but [claimant] was unable to undergo a sleep study. Dr. Rhinehart recommended the claimant to follow-up in several months.

*Id.*

The ALJ did not specifically cite evidence as to Plaintiff's ejection fraction as supporting or refuting Dr. Rhinehart's opinion. However, given Plaintiff's argument that the ejection fraction supported Dr. Rhinehart's impression, the court has considered it. Dr. Rhinehart referenced an ejection fraction of 25%. Tr. at 644. However, it is unclear where he found such an ejection fraction in the record.[8] During Plaintiff's September and October 2018 hospitalization, his ejection fraction was estimated as 40–45%. *See* Tr. at 350, 357–59. In July 2019, his ejection fraction was again estimated at 40–45%. *See* Tr. at 623. Because there is no evidence to support the reduced ejection fraction Dr. Rhinehart referenced over the relevant period, it was not credible evidence that contradicted the ALJ's conclusion as to the persuasiveness of Dr. Rhinehart's opinion.

For the foregoing reasons, substantial evidence supports the ALJ's finding that Dr. Rhinehart's statements were not persuasive.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

---

[8] Plaintiff references ejection fraction findings in his brief, but the findings he refers to are from the October 2018 operative report and discharge summary reflecting an estimated ejection fraction of 40–45%. *See* ECF No. 16 at 19 (referencing Tr. at 350, 357–59).

IT IS SO ORDERED.

February 2, 2022
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge